UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

COMPASS, INC. and
COMPASS FLORIDA, LLC,

*Plaintiffs*,

v.

MY FLORIDA REGIONAL MLS, INC.,
d/b/a STELLAR MLS,

*Defendant*.

Case No. 6:26-cv-02651________

**COMPLAINT FOR VIOLATION OF 15 U.S.C. § 1**

**PERMANENT INJUNCTIVE RELIEF REQUESTED**

**DECLARATORY RELIEF REQUESTED**

**DEMAND FOR A JURY TRIAL**

## INTRODUCTION

1. Homeowners should be free to choose how to sell their own homes without having a competition-killing real estate industry organization tell them how to do it. Real estate agents should be able to compete fiercely to be hired by clients, and real estate brokers should be able to compete to attract agents to their firms, without their competitors banding together to restrict how they compete. In dozens of cities across the country, homeowners and agents are free to do that. But this much-needed competition and choice are blocked in more than 19 Florida counties because of rules set and enforced by Defendant My Florida Regional MLS, Inc., d/b/a Stellar MLS ("Stellar MLS"). A majority of Stellar MLS's Board of Directors are working brokers and agents who compete with Compass and its agents, and they are dictating how Compass and its agents can and cannot compete, how Compass and its agents can and cannot serve their clients, and how homeowners can and cannot market their own homes. Plaintiffs bring this lawsuit under 15 U.S.C. § 1 to stop Stellar MLS's anticompetitive behavior.

2. Homeowners want a choice. Plaintiffs Compass, Inc. and Compass Florida, LLC (together, "Compass") offer a phased marketing strategy, See It First™ on Compass, that gives homeowners that choice. Some homeowners choose to use a multiple listing service ("MLS") to market their homes. Some want to publicly market their homes before they go into the MLS—through internet websites, yard signs, social media, and newsletters, among other public marketing methods. Compass and its agents do not force homeowners to use phased marketing or any other strategy; in fact,

Compass requires the homeowners' written approval to publicly market outside of Stellar MLS. Under Florida law, homeowners are entitled to decide how to market their own properties.

3. One reason homeowners like having this choice is that they can use pre-MLS public marketing to test the price of a home with real-world feedback from agents and their clients, which helps ensure the home is not overpriced when it lists in the MLS and the MLS sends the listing to every real estate website and data vendor in the world. Moreover, this strategy helps agents and their clients gather feedback on price without the risk of their listings being permanently soiled by price cuts and extended "days on market" that hurt the perceived value of the homes. Homeowners love this choice: where MLSs allow phased marketing, approximately 48% of Compass homeowners used it. Even when publicly marketed pre-MLS, the vast majority of those listings actually sold in the last phase (after being submitted to the MLS). Compared with listings sent straight to the MLS, as Stellar MLS requires, homes using phased marketing have sold for 4.6% more, with 34% fewer days on the MLS and 29% fewer price cuts.

4. Stellar MLS, one of the largest MLSs in Florida by subscriber count,[1] with a service area spanning more than 19 Florida counties, is a combination of Compass'

---

[1] *Merri Jo Cowen Transitions from Stellar MLS CEO Role to Lead Growth of UCO*, Stellar MLS (Mar. 11, 2026), https://www.stellarmls.com/merri-jo-cowen-transitions-from-stellar-mls-ceo-role-to-lead-growth-of-uco (describing Stellar MLS as "the largest multiple listing service in the state of Florida"); *Stellar MLS Expands into Hernando County, Florida*, Stellar MLS (Sept. 23, 2026), https://www.stellarmls.com/stellar-mls-expands-into-hernando-county-florida (Stellar MLS "now serves more than 19 counties").

direct competitors, and it is controlled by a Board of Directors dominated by Compass' direct competitors. Under the Stellar MLS rules, once a homeowner markets the home anywhere on the internet, posts the home anywhere on social media, puts up a yard sign, sends an email blast, or publicly markets the home in any way Stellar MLS defines as "public marketing," the listing must be given to Stellar MLS and its co-conspirators within one business day, and the agent and homeowner must follow Stellar MLS restrictions—even if the homeowner gave the agent a lawful marketing instruction that conflicts with the Stellar MLS rules.[2]

5. Although Florida law requires real estate agents to use skill, care, and diligence and to perform any additional duties they agree to, and requires agents who act as single agents to be loyal and obedient to their clients,[3] if a real estate agent follows the client's lawful instruction to publicly market a home outside of Stellar MLS, the agent then faces automatic fines of $500 for a first offense and $2,500 for a second and, for a third or later offense, a mandatory hearing and fines of up to $15,000, suspension, or expulsion from the very MLS they need to do business.[4] More than 40 years ago, in its seminal report on U.S. residential real estate, the U.S. Federal Trade Commission ("FTC") warned that when an MLS forces members to submit their listings,

[2] Stellar MLS, Stellar MLS Rules and Regulations, arts. 05.01, 05.11(B)–(C) (last updated Nov. 6, 2026), *available at* https://rules.stellarmls.com/ ("Stellar MLS Rules").

[3] Fla. Stat. §§ 475.278(2)(c), (2)(g), (3)(a)(2), (3)(a)(4).

[4] Stellar MLS Rules arts. 05.01, 11.04(C).

"[a]lternative methods of selling houses are effectively foreclosed."[5] That is what Stellar MLS has done.

6. Compass brings this lawsuit to stop these illegal rules. Competitors may not band together to dictate how their rivals serve customers and deprive homeowners of choice. Yet that is what Stellar MLS is doing: using control of a home listing database that real estate agents in much of Central, Southwest, and North Florida cannot work without, Stellar MLS and its co-conspirators block Compass' better home marketing product to protect Compass' competitors from having to compete with Compass on the merits for clients and agents.

7. Instead of fixing its anticompetitive rules, Stellar MLS has refused Compass' demands that it commit not to fine or punish agents for publicly marketing listings outside the MLS.[6] Stellar MLS's excuses for punishing agents for phased marketing are meritless. In fact, MLSs serving more than 350,000 brokers and agents in at least 12 states do not fine or punish pre- or off-MLS public marketing, and in these markets, the issues Stellar MLS claims will result from pre- or off-MLS public marketing have not transpired. Stellar MLS allowed pre- and off-MLS public marketing until March

[5] FTC, *The Residential Real Estate Brokerage Industry* 130 (Dec. 1983) ("Butters Report").

[6] Email from Jennifer E. Vanover, counsel for Stellar MLS, to Ethan Glass, Chief Legal Officer, Compass International Holdings (Sept. 1, 2026) (on file with Eimer Stahl LLP) ("Sept. 1 Email"); Letter from John A. Boudet, counsel for Stellar MLS, to Nathan P. Eimer, counsel for Compass (Oct. 20, 2026) (on file with Eimer Stahl LLP) ("Oct. 20 Letter").

2020.[7] Stellar MLS claims its restrictions promote "transparency." But Stellar MLS does not care about homeowners; it is a members-only database that homeowners are unable to access and that fines agents just for following their client's lawful public marketing instructions. Moreover, Compass does not "free ride"; it pays Stellar MLS dues, and it contributes a substantial number of listings to Stellar MLS.

8. Stellar MLS and its co-conspirators have caused substantial economic harm to Compass and its agents, in addition to the immense harm Stellar MLS has caused to homeowners. Compass seeks treble damages, to the full extent allowed by the law, for every dollar of harm Stellar MLS and its co-conspirators caused Compass. Compass paid over $175 million to defend and settle lawsuits resulting from MLS policies it could not avoid because rules like Stellar MLS's foreclosed the option for Compass' agents to publicly market a home without giving it to Stellar MLS, thus forcing them to follow Stellar MLS's policies. Although the settlements were the result of MLS rules, Stellar MLS paid nothing. Stellar MLS forces Compass and its agents to give their valuable home listing data to Stellar MLS, which Stellar MLS then sends to real estate portals that earn hundreds of millions of dollars displaying Compass listings, and licenses to technology vendors, paying Compass nothing. Because Compass is subject to Stellar MLS's rules and because Stellar MLS distributes and licenses Compass' data to companies that use it against Compass and its agents, Compass has

---

[7] *See* Stellar MLS, *Rules and Regulations* arts. 5.1, 5.11 (Apr. 12, 2022) (public-marketing requirements marked "(Amended 3/2020)"), https://docs.stellarmls.com/Stellar_Rules_and_Regulations-v22-20220412_075128.pdf.

lost commissions on listings and agents it could not win without the ability to offer See It First™ on Compass, as well as ancillary revenue (such as mortgage, title, and escrow). All of these harms, and any others caused by Stellar MLS's illegal rules, must be paid back in triplicate and the illegal rules must be enjoined.

## NATURE OF THE CASE

9. This lawsuit challenges the unlawful conduct of an MLS. MLSs are not pro-consumer, pro-competitive institutions; they are combinations of competing brokers and agents that make rules governing competition among them.[8] As such, MLS rules have long been regarded warily by courts and antitrust enforcers. When a group of competitors like an MLS "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[9] As the FTC observed, the people who control the MLS "control . . . the most important aspects of brokerage practices."[10] That control has been used in the past to do things like set commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

10. In the 1940s, the U.S. Department of Justice ("DOJ") brought civil and criminal charges against MLSs that set commission rates.[11] Since then, there have been over

---

[8] Except where applicable law or regulations would require otherwise, the terms "agent" and "broker" are used interchangeably throughout this complaint.

[9] *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980).

[10] Butters Report at 15.

[11] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 487 (1950).

100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[12] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[13]

11. Stellar MLS is one of the largest MLSs in Florida, with approximately 75,000 real estate professional subscribers—most of them competing brokers and agents—covering more than 19 counties across Central, Southwest, and North Florida.[14] Stellar MLS is governed by a Board of Directors dominated by those competitors. In fact, the majority of the members of Stellar MLS's Board of Directors are working brokers or agents who compete with each other and with Compass and its agents.[15]

---

[12] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).

[13] *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786-SB, 2009 WL 3150388, at *2 (D.S.C. Aug. 27, 2009).

[14] *Stellar MLS Expands into Hernando County*, *supra*; *Merri Jo Cowen Transitions*, *supra*.

[15] *Board of Directors*, Stellar MLS, https://www.stellarmls.com/about/directors (listing 19 directors and five officers); Stellar MLS, Operating Policies & Procedures Manual § I.B.1, at 2 (Aug. 16, 2024), https://irp.cdn-website.com/3d0f9886/files/uploaded/Stellar_MLS_Operating_Policies_and_Procedures_

12. For decades, Stellar MLS has been an unavoidable and dominant feature of residential real estate brokerage in its territory. Participation in Stellar MLS is essential for any real estate agent to work in many areas of Central, Southwest, and North Florida; real estate agents cannot effectively represent clients in those areas without being members of Stellar MLS subject to its rules. While many homeowners are well served by pre-MLS or off-MLS marketing strategies, the importance of the MLS means it is still essential for agents to belong to the MLS in the area where they work. Thus, agents cannot survive in business without participating in the MLS.

13. Showing Stellar MLS's incredible market power, agents must follow Stellar MLS's rules or Stellar MLS will fine and punish them, potentially by exclusion from Stellar MLS.[16] Stellar MLS polices its members through compliance staff who use "an automated database scanning system" and follow up on "confidential agent reported violations" that its members (who are competitors) file against one another.[17] Stellar MLS encourages competing agents to report to Stellar MLS any rule violations by their competitors for punishment. While the MLS is one of the rare private companies that fines and punishes its own customers, agents accept this because Stellar MLS membership is critical to their business and because it blunts competition they might otherwise face without the MLS rules.

---

as_of_08-16-2024.pdf (Board "consists of the Officers . . . and the elected directors"); *Licensee Search*, Fla. Dep't of Bus. & Pro. Regul., https://www.myfloridalicense.com.

[16] Stellar MLS Rules arts. 11.01, 11.04.

[17] *Fines & Violations FAQs*, Stellar MLS, https://www.stellarmls.com/resources/rules-regulations/fines-and-violations-faqs.

14. Stellar MLS Rules Articles 05.01 and 05.11(B)–(C) (together, the "Anticompetitive Rules") specifically block competition among brokers and agents, and homeowner choice.[18] Article 05.01 forces homeowners, brokers, and agents to give Stellar MLS their listings and forces them into all of the Stellar MLS restrictions: a participant must enter each listing of a covered property type in Stellar MLS's service area within five business days (excluding weekends and federally recognized holidays) after the later of the owner's dated signature or the listing agreement's beginning date, or within one business day of any public marketing, whichever is sooner. One of those restrictions, Article 05.01's public-marketing provision, dictates how a homeowner can publicly market their property. Unless they give the listing to Stellar MLS within one business day, homeowners and agents may not market the property to the public, which Article 05.01 defines to include flyers in windows, yard signs, public-facing websites, brokerage website displays, email blasts, multi-brokerage listing sharing networks, and applications available to the general public. Even though Stellar MLS does not own the home or represent the homeowner, Stellar MLS is dictating how the homeowner and their agent must sell the home.

15. The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS and marketed how Stellar MLS directs (a choice between two extremes: listing it immediately through an MLS and incurring the disadvantages described above; or not publicly marketing the

[18] Stellar MLS Rules arts. 05.01, 05.11(B)–(C).

home at all). Through these rules, Stellar MLS and its co-conspirators control how homeowners and agents market properties on-Stellar MLS and outside-Stellar MLS. Stellar MLS and its co-conspirators, thus, control home marketing across the entire real estate industry in much of Central, Southwest, and North Florida.

16. These rules stand directly in the way of competition. Compass has invested hundreds of millions of dollars in developing technology, competition with other brokerages for agents and clients, and innovative marketing strategies. If a homeowner chooses phased marketing, it proceeds in three phases. In the first phase, the homeowner chooses to publicly market the property via channels outside of the MLS, such as select internet websites, social media, newsletters, yard signs, word of mouth, or other techniques. Homebuyers do not need to work with a Compass agent to view these listings, and agents at other brokerages can view these listings on request. In the second phase, the listing is displayed on the Compass and Redfin websites as a "Coming Soon," and other agents can learn about the property from the MLS. In the third phase, the listing is published by the MLS to tens of thousands of websites and other data recipients.

17. Phase One is blocked, and Phase Two is severely restricted, by Stellar MLS rules: Phase One listings cannot be publicly marketed, and Phase Two Coming Soon listings have severe restrictions on what the homeowner and agent can do. Specifically, Stellar MLS requires a Coming Soon listing to be entered into Stellar MLS, where it is available to all participants and subscribers, and bars it from returning to Coming

Soon status once it leaves that status.[19] Stellar MLS states that all Coming Soons must be restricted to 14 days, even if the homeowner wants their home listed as a Coming Soon for longer.[20]

18. The phased marketing strategy has several advantages for homeowners. MLSs append to the listing (which is the ***homeowner's*** sales pitch to buyers) the history of price changes and days on market, which are perceived by buyers as signaling homeowner desperation. Having price changes and days on market in the homeowner's own advertisement often prevents homeowners from obtaining the full value of their property. This is unique to residential real estate: sellers of other goods are not forced to include, in their advertisements, price changes or how long the good has been for sale. By testing an aspirational price in a pre-MLS phase, homeowners may avoid the harms of unnecessary price cuts or days on the market being added by the MLS to the listing. Phased marketing also offers the chance to sell a house without the inconvenience and loss of choice that comes with listing it for sale through the MLS. In sum, phased marketing is good for some homeowners, good for agents seeking to represent those homeowners, and good for Compass. It does, however, threaten incumbents (that comprise and control Stellar MLS) by forcing them to compete with Compass for homeowner clients, and to compete with Compass for agents who want a brokerage with innovative marketing strategies and choices they

---

[19] *Id.* art. 05.11(E).

[20] *Id.*

can offer to their clients.

19. This unreasonably restrains trade in two ways. Stellar MLS's agent members, including its Board members, compete directly with one another and with Compass' agents for homeowners, and the Anticompetitive Rules block competition from brokers and agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[21] Moreover, Stellar MLS is blocking competition between competing brokerages (the firms with which agents affiliate) to attract agents with innovative marketing strategies to win more clients.

20. A long history of antitrust enforcement shows why the Anticompetitive Rules violate the law. As recognized by the FTC, to comply with the antitrust laws, an MLS must give real estate brokers, agents, and homeowners true alternatives to the MLS—alternatives that existed for over 50 years.[22] For example, the "Fourteen Points" antitrust policy adopted in 1971 by the National Association of REALTORS® ("NAR"), which governs Stellar MLS,[23] expressly provides that an "***MLS shall not: Make any rule regulating the advertising or promotion of any listing,***"[24] and preserves an

---

[21] Butters Report at 130.

[22] *Id.* at 129–30.

[23] Stellar MLS Rules art. 01.01 (listing Stellar MLS's REALTOR® association shareholders).

[24] Butters Report at 134 n.354 (emphasis added).

alternative to the MLS, which it calls an "office exclusive."[25] Before Stellar MLS adopted the Anticompetitive Rules in March 2020, its rules placed no restrictions on how office exclusives were publicly marketed.[26] As late as June 2019, Stellar MLS's "Owner's Waiver of MLS Entry" form let a homeowner keep a listing out of Stellar MLS "[f]or the entire listing period" and said nothing about how the listing could be marketed.[27] But today, Stellar MLS discourages brokers from accepting office exclusives—precisely what the Fourteen Points forbid.[28]

21. The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings [like the Anticompetitive Rules]. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[29] The Anticompetitive Rules violate the Fourteen Points antitrust policy and cause the exact

---

[25] *Id.* ("MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'").

[26] *See* My Florida Regional Multiple Listing Service, *Rules and Regulations* art. 5, § 11 (rev. Sept. 2014) ("Exempt Listings"), https://www.unlimitedmls.com/forms/MFR-MLS-Rules-and-Regs-December-2014.pdf; Stellar MLS, *Rules and Regulations*, *supra* note 7, arts. 5.1, 5.11.

[27] Stellar MLS, *Owner's Waiver of MLS Entry* (rev. June 2019), https://wpbor.com/wp-content/uploads/2019/06/owners-waiver-of-mls-entry-2-1.pdf.

[28] Stellar MLS Rules art. 05.11(B) (owner, listing broker, and agent must sign the MLS Options for Property Owners form); *MLS Options for Property Owners*, Stellar MLS (rev. May 2026), https://irp.cdn-website.com/3d0f9886/files/uploaded/Multiple+Options+for+Sellers+June+2026.pdf (owners choosing an office exclusive must certify that they are "knowingly and voluntarily relinquishing the substantial advantages of full MLS distribution").

[29] Butters Report at 130.

competitive injury about which the FTC warned. The DOJ commented on a policy similar to the Anticompetitive Rules that the "[p]olicy restrict[ed] home-seller choices and preclude[d] competition from new listing services."[30] The DOJ's comment echoed the FTC's 1983 conclusion that "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[31]

22. In short, under federal and state law, brokers and agents are entitled to offer, and consumers are entitled to choose from, more than the limited options that the actions of Stellar MLS's combination of competitors have forced upon the industry. But Stellar MLS blocks that choice and the competition that choice would bring.

23. Stellar MLS and its co-conspirators have harmed brokers and agents including Compass, its agents, and homeowners. Compass is blocked from winning clients, from attracting agents, and from receiving the commissions and other benefits that would come from its competition through innovative marketing strategies. Homeowners are hurt because they (1) cannot sell their own properties however they legally want, including in ways that test the market, and manage the sales process; (2) cannot benefit from marketing strategies that, on average, provide them with a 4.6% higher sale price, 34% fewer days on the MLS, and 29% fewer price cuts; and (3) cannot fully benefit from the duties Florida law imposes on their agents and any additional duties that

---

[30] *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations).

[31] Butters Report at 130.

homeowners and their transaction brokers agree to.[32]

24. Stellar MLS has no valid justifications for its illegal conduct. Any claim Stellar MLS makes is undermined by recent history: until March 2020, Stellar MLS allowed agents and their clients to market pre- and off-MLS without fines, Stellar MLS succeeded, and homes were legally sold throughout Central, Southwest, and North Florida. Moreover, MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed, and homes are still sold legally. Stellar MLS's restraints on competition are not about "transparency." Stellar MLS does not allow homeowners or homebuyers to become members or to directly search or access its database. Stellar MLS does not accept for-sale-by-owner listings.[33] Stellar MLS's own rules allow listings to be hidden, just as long as they are not publicly marketed outside of Stellar MLS.[34] Its restraints also have nothing to do with "free-riding." The free-riding justification was rejected by a federal appellate court in nearly identical circumstances.[35] Compass also gets nothing for free: agents affiliated with Compass brokerages pay dues and provide Stellar MLS with a substantial number of listings. Even when homeowners publicly market their properties pre-MLS, most would still instruct Compass to give their listings to the MLS

---

[32] Fla. Stat. § 475.278(2)(g), (3)(a)(2), (3)(a)(4).

[33] *See* Stellar MLS Rules art. 05.02.

[34] *See id.* art. 05.11(B) (an Office Exclusive listing "will only be available to the listing broker's office").

[35] *Realcomp II, Ltd.*, 635 F.3d at 835.

before they sell (over 93% of all Compass listings, including listings publicly marketed pre- and off-MLS, are sold after being submitted to the local MLS). On the other hand, Stellar MLS gives listings to third-party portals and other companies that do not contribute any listings.[36]

25. Compass hereby brings claims against Stellar MLS for violating the Sherman Act, 15 U.S.C. § 1.

## PARTIES

26. Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is an innovative, national real estate technology company and brokerage that provides a proprietary, end-to-end cloud-based platform for agents and their clients. Under the brand names "@properties," "Ansley Real Estate," "Better Homes & Gardens Real Estate," "Century 21," "Christie's International Real Estate," "Coldwell Banker," "Compass," "Corcoran," "ERA," "Latter & Blum," "Sotheby's International Realty," and "Washington Fine Properties," Compass operates brokerages and licenses franchises throughout the United States, including Florida. Compass empowers thousands of agents with cutting-edge technology to better serve homebuyers and homeowners. Compass also has title & escrow and mortgage joint-venture operations across the United States, including Florida.[37]

---

[36] *The Logistics of Listing Distribution*, Stellar MLS, https://www.stellarmls.com/distribution.

[37] *See* Compass, Inc., Annual Report (Form 10-K) (Feb. 27, 2026) (describing Compass' title and escrow services and its mortgage joint ventures, including Guaranteed Rate Affinity,

27. Plaintiff Compass Florida, LLC is a Delaware limited liability company with its principal place of business at 1212 Lincoln Rd, Suite 113, Miami Beach, FL 33139. Compass Florida, LLC is an indirect subsidiary of Compass, Inc.

28. Defendant Stellar MLS is a Florida profit corporation with its principal place of business at 247 Maitland Avenue, Suite 2000, Altamonte Springs, Florida 32701.[38] Its shares are owned by 18 local REALTOR® associations (the "Shareholder Associations"), which appoint its Board of Directors.[39] Stellar MLS has approximately 75,000 subscribers.[40] Through data share agreements, Stellar MLS also gives subscribers of other MLSs direct access to its listings, including BeachesMLS's 43,000

---

acquired in "the Anywhere Merger"); *About Us*, Sunbelt Title, https://sunbelttitle.com/about-us/ (title company with "deep roots in Florida's real estate market" that is "part of Anywhere Real Estate"); *Kevin Kruse, Mortgage Advisor*, Coldwell Banker Realty, https://www.coldwellbankerhomes.com/fl/punta-gorda/mortgage-advisor/kevin-kruse/maid_1500/ (disclosing that "Coldwell Banker Realty and Guaranteed Rate Affinity, LLC share common ownership").

[38] *Detail by Entity Name: My Florida Regional MLS, Inc.*, Fla. Dep't of State, Div. of Corps. (Doc. No. P95000046840).

[39] Stellar MLS Rules art. 01.01 (listing the Bartow Board of REALTORS®; East Polk County Association of REALTORS®; Englewood Area Board of REALTORS®; Flagler County Association of REALTORS®; Gainesville-Alachua County Association of REALTORS®; Lakeland Association of REALTORS®; New Smyrna Beach Board of REALTORS®; Ocala Marion County Association of REALTORS®; Okeechobee County Board of REALTORS®; Orlando Regional REALTOR® Association; Osceola County Association of REALTORS®; REALTOR® Association of Sarasota and Manatee County; REALTORS® Association of Lake and Sumter Counties; REALTORS® of Punta Gorda-Port Charlotte-Northport-Desoto, Inc.; Suncoast Tampa Association of REALTORS®; Venice Area Board of REALTORS®; West Pasco Hernando Board of REALTORS®; and West Volusia Association of REALTORS®). Stellar MLS's website lists the REALTORS® Association of Citrus County in place of the Okeechobee County Board of REALTORS®. *Shareholders*, Stellar MLS, https://www.stellarmls.com/about/shareholders.

[40] *Stellar MLS Expands into Hernando County*, Stellar MLS, https://www.stellarmls.com/stellar-mls-expands-into-hernando-county-florida (Stellar MLS "serves more than 75,000 customers").

subscribers and the more than 57,000 real estate professionals served by FMLS.[41] The majority of the members of Stellar MLS's Board of Directors are working brokers and agents who compete with each other and Compass and its agents.

29. Stellar MLS is a contract, combination, or conspiracy of competing agents and brokers. Stellar MLS's participating brokers and agents compete directly with one another and with Plaintiffs for homeowner clients, homebuyer clients, and agents. Those brokers and agents follow and enforce Stellar MLS's rules, and Stellar MLS is governed by a Board of competing brokers and agents.

30. Stellar MLS Rules Article 05.01 applies to listings "located in the counties of the Stellar MLS service area."[42] Stellar MLS says it now serves more than 19 counties in Central, Southwest, and North Florida. In September 2026, after the merger of the West Pasco Board of REALTORS® and the Hernando County Association of REALTORS®, Stellar MLS announced that it would serve as "the exclusive MLS provider to the newly merged West Pasco Hernando REALTORS®."[43]

## DEFENDANT'S CO-CONSPIRATORS

31. Competing agents, including those enforcing Stellar MLS's rules, members of

---

[41] *BeachesMLS and Stellar MLS Announce Major Data Share Expansion, Connecting Agents and Listings Across Florida*, Stellar MLS (Oct. 15, 2025), https://www.stellarmls.com/beachesmls-and-stellar-mls-announce-major-data-share-expansion-connecting-agents-and-listings-across-florida; *Reciprocals & Data Shares*, Stellar MLS, https://www.stellarmls.com/reciprocals-datashares (FMLS data share).

[42] Stellar MLS Rules art. 05.01.

[43] *Stellar MLS Expands into Hernando County*, Stellar MLS, https://www.stellarmls.com/stellar-mls-expands-into-hernando-county-florida.

Stellar MLS's Board of Directors, and members of its Hearing Panels, conspired with each other, with Stellar MLS, and with Stellar MLS's owners, the Shareholder Associations, to design, approve, enforce, and implement the Anticompetitive Rules. Stellar MLS's Board of Directors considers written complaints of rule violations and may direct sanctions.[44] Its Hearing Panels, which hear challenges to alleged violations and act "on behalf of" the Board, are made up of volunteers appointed by the Shareholder Associations, and no more than one licensee from any firm may sit on a panel.[45] Stellar MLS's Board of Directors "is comprised of appointees from" the Shareholder Associations, and the Shareholder Associations and Stellar MLS's customer associations make up its MLS Advisory Council and, according to Stellar MLS, "they determine the MLS's rules and regulations."[46] On information and belief, Stellar MLS has encouraged other MLSs to adopt and maintain rules similar to the Anticompetitive Rules.

32. Stellar MLS's co-conspirators performed acts and made statements in furtherance of Stellar MLS's anticompetitive conduct. Stellar MLS is jointly and severally liable for the acts of its co-conspirators, whether or not they are named as defendants in this complaint.

---

[44] Stellar MLS Rules arts. 12.01–12.02.

[45] Stellar MLS, Operating Policies & Procedures Manual, § VII.G, at 17–18 (Aug. 16, 2024), https://irp.cdn-website.com/3d0f9886/files/uploaded/Stellar_MLS_Operating_Policies_and_Procedures_as_of_08-16-2024.pdf.

[46] *Shareholders*, Stellar MLS, https://www.stellarmls.com/about/shareholders.

## JURISDICTION AND VENUE

33. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Compass brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from Stellar MLS's and unnamed co-conspirators' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

34. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

35. This Court has personal jurisdiction over Stellar MLS because its headquarters and principal place of business are in this district, and Stellar MLS conducts substantial business in this district.

36. Venue is appropriate in this district and in the Orlando Division because Stellar MLS's headquarters and principal place of business are in this district and because a substantial portion of the transactions and events giving rise to this action—the agreement among the competing brokerages and the actual and threatened enforcement of anticompetitive rules—occurred in this district. 28 U.S.C. § 1391; 15 U.S.C. § 22. Stellar MLS was organized as a Florida corporation in 1995 and lists its principal office in this district in its filings with the Florida Secretary of State.[47]

## TRADE AND COMMERCE

37. Stellar MLS has entered into agreements with each of its approximately 75,000

[47] *Detail by Entity Name: My Florida Regional MLS, Inc.*, Fla. Dep't of State, Div. of Corps. (Doc. No. P95000046840).

subscribers and facilitates the sale of residential homes and condominiums with total closings valued in at least the tens of billions of dollars. In 2024 alone, Stellar MLS reported 157,400 residential sales with a total sales volume of more than $76 billion.[48] These transactions, together with the associated mortgage financing, out-of-state buyers and homeowners, and national title insurance, are in and have a substantial effect on interstate commerce, as used in 15 U.S.C. § 1.

## RELEVANT MARKETS

38. Relevant Product Markets. There are at least three relevant product markets: (1) provision of real estate brokerage services to homeowners (the "Brokerage Services Market"); (2) provision of real estate brokerage services to agents who represent homeowners (the "Agent Services Market"); and (3) provision of multiple listing services to brokers and agents who represent homeowners (the "MLS Market") (collectively, the "Relevant Markets").

39. The Brokerage Services Market includes the services that brokerages and agents provide their homeowner clients. Those services include, among other things, advising on pricing and marketing, conducting marketing activities, and negotiating with buyers. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of brokerage services likely would undertake at least a small but significant and non-

[48] Stellar MLS, *2024 Monthly MLS Statistics Reported by County* (Dec. 2024) (year-to-date residential totals), https://irp.cdn-website.com/3d0f9886/files/uploaded/December_2024_County_Reports.pdf.

transitory increase in price or other worsening of terms. Compass and the brokerages and agents who participate in and control Stellar MLS compete in the Brokerage Services Market.

40. The Agent Services Market consists of services that brokerages provide to agents. Those services include, among other things, sharing commissions with the agent, developing and maintaining a strong brand that appeals to consumers, investing in and providing technology agents can use in representing clients, and supporting agents in representing their clients, including by offering innovative and appealing ways to better serve their clients. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of agent services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages who participate in and control Stellar MLS compete in the Agent Services Market.

41. The MLS Market consists of the services that MLSs provide to brokers and agents. Those services include a repository of property listings, distribution of listings to other agents, and syndication of those listings through data sharing feeds to other participants, including the other real estate brokers and agents in the area and the large public-facing aggregator websites such as third-party portals. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of multiple listing services likely would undertake at least a small but significant and non-transitory increase in price or

other worsening of terms. Stellar MLS participates in the MLS Market.

42. Relevant Geographic Market. The relevant geographic market for each of the defined product markets is no larger than Stellar MLS's service area. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of each of the relevant products in this geographic market likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Brokers and agents cannot avoid Stellar MLS's rules by using a neighboring MLS or an MLS with a data sharing agreement with Stellar MLS for several reasons:

a. Brokers and agents need to be members of the MLS that covers their region because being an "out-of-region" broker or agent makes it harder to attract clients and agents.

b. Stellar MLS's reciprocal-access agreements let agents search another MLS's listings, but agents using that access cannot "enter, create, or update listings" in that MLS.[49] Reciprocal access therefore lets agents view another MLS's inventory but does not let them list homes in it.

c. Stellar MLS Rules Article 05.01 requires a participant to enter its listings "located in the counties of the Stellar MLS service area" into Stellar MLS. The rule contains no exception for participants who also belong to

[49] *Reciprocals & Data Shares*, Stellar MLS, https://www.stellarmls.com/reciprocals-datashares (FAQ, "Can I use all the features available in the other MLS?").

another MLS.

d. Stellar MLS rules apply to all agents and listings affiliated with a "Participant," which means that every listing by an agent affiliated with a brokerage must be given to Stellar MLS, even if the agent is not a member of Stellar MLS, does not submit it to Stellar MLS, and the homeowner does not want it in Stellar MLS.[50] Even if the brokerage has only a single agent who needs to access Stellar MLS, the entire brokerage must become a member. Specifically, Stellar MLS allows "only one designated Participant per company," and that participant is responsible for ensuring that every affiliated subscriber complies with Stellar MLS's rules.[51] Stellar MLS bills fines to the agent, but the participant "is ultimately responsible," and a subscriber's violation "can subject the participant to the same or other discipline."[52] Thus, if one agent in a brokerage needs Stellar MLS access, then all agents in that brokerage are bound by Stellar MLS's rules.

43. To serve their clients and compete in the Stellar MLS service area, brokers and agents must have access to Stellar MLS and follow Stellar MLS's rules. Thus, in both the Brokerage Services Market and the Agent Services Market, the brokers and agents

---

[50] Stellar MLS Rules art. 05.01 (requiring that "Participant's listings" be entered into Stellar MLS).

[51] *Id.* art. 01.03.

[52] *Id.* arts. 11.03, 11.04.

that combine to adopt, follow, and enforce the Stellar MLS rules collectively have market power. In the MLS Market, Stellar MLS has market power.

44. As the DOJ has alleged, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing brokers) has market power in almost every relevant market."[53] And, as the DOJ and FTC reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . . MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[54]

## FACTUAL ALLEGATIONS

***MLSs and the Antitrust Laws***

45. An MLS aggregates listings submitted by participating agents into a common database and makes the resulting data available to MLS participants and subscribers. Stellar MLS is in the business of operating a broker cooperative by:

a. providing a facility for the orderly correlation and dissemination of listing information so that participants can better serve their clients, customers,

---

[53] Am. Compl. ¶ 24, *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140 (N.D. Ill. Oct. 4, 2005), *reprinted in* 73 Fed. Reg. 36,104, 36,105 (June 25, 2008).

[54] DOJ & FTC, *Competition in the Real Estate Brokerage Industry* 12 (Apr. 2007) ("2007 DOJ/FTC Report"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.

and the public;

b. enhancing cooperation among participants;

c. accumulating and disseminating information that authorized participants use to prepare appraisals, analyses, and other valuations of real property;

d. giving participants who appraise real estate a means to contribute to common databases;[55] and

e. distributing participants' listing data daily and directly to Realtor.com, a third-party consumer website, unless the broker (or, for a particular listing, the agent and seller) opts out, and to other third-party websites that brokers opt into.[56]

46. MLSs also make and enforce rules. Stellar MLS explains how competing agents can help enforce Stellar MLS's rules, and it provides a specific process to report violations of Stellar MLS Rules Article 05.01.[57]

47. In addition to operating this members-only database, some MLSs, like Stellar MLS, distribute and license agent and homeowner data to third parties, such as real

[55] Stellar MLS Rules art. 01.02.

[56] *The Logistics of Listing Distribution*, Stellar MLS, https://www.stellarmls.com/distribution ("Realtor.com | Broker Automatic Opt-In Enabled"; "Stellar MLS sends data daily and directly to Realtor.com.").

[57] *Clear Cooperation and Delayed Distribution*, Stellar MLS, https://www.stellarmls.com/DelayedDistribution ("we rely on you to let us know when other agents are violating the rules. Through Stellar Central, navigate to Rules and Regulations, then Report a Clear Cooperation Violation . . . ."); *see* Stellar MLS Rules art. 05.01 (one-business-day submission requirement).

estate web portals and technology vendors, which monetize it in various ways, *e.g.*, selling leads for potential buyers to agents by displaying the data on websites with advertising alongside, and by creating tools to recruit agents from brokerages.[58]

48. Brokerages that have adopted the traditional, mutually aligned business model of real estate sales rely passively on one another to provide their listings to each other via the MLS. MLSs that are comprised of or governed by brokerages and agents with traditional business models have a strong financial incentive to impair the business models of innovators and mavericks who seek to offer marketing options to homeowners that eschew immediate and automatic sharing of their listings on the MLS regardless of the circumstances or preferences of the homeowner. Such MLSs, and the traditional brokerages and agents that control them, try to prevent their members from publicly marketing properties off-MLS, because publicly marketing off-MLS presents a competitive challenge to the traditional brokerages.

49. MLSs are private companies. Unlike agents, MLSs do not owe agency-based duties to anyone, let alone consumers. They are not government entities or law enforcement agencies, even though they pretend to have similar powers when interacting with agents. MLSs are not inherently pro-consumer, pro-competitive institutions; they are organizations of competing agents that make rules governing

[58] *The Logistics of Listing Distribution*, Stellar MLS, https://www.stellarmls.com/distribution ("Stellar MLS sends data daily and directly to Realtor.com."); *Data Delivery*, Stellar MLS, https://www.stellarmls.com/data-delivery (Vendor Product feeds require "[a] three-party agreement between the Vendor, Broker, and Stellar MLS" and "[a] fee of $7500 per product annually and $2500 for each additional product").

competition among them. MLSs wield the unique power to fine and punish their own members.

50. As such, MLSs and their rules have long been regarded warily by courts and antitrust enforcers. When competitors "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[59] As the FTC wrote, control over the MLSs gives "Realtor groups the single most powerful tool available for shaping brokerage practice."[60] That control has been used in the past to do things like set commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

51. In the 1940s, the DOJ brought civil and criminal charges against MLSs that set commission rates.[61] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[62] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller

---

[59] *Realty Multi-List*, 629 F.2d at 1370.

[60] Butters Report at 92–93.

[61] *See Nat'l Ass'n of Real Est. Bds.*, 339 U.S. at 487.

[62] *Realcomp II, Ltd.*, 635 F.3d at 819.

or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[63]

52. Recognizing the pro-competitive benefits of pre-MLS marketing strategies is consistent with the federal antitrust agencies' long-standing views of the real estate markets. "[T]he Agencies . . . have challenged, as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business models."[64] For example, the DOJ and FTC have brought cases ensuring that discount brokers and fee-for-service brokers were not denied MLS access.[65]

53. This history is long-standing and specific. On behalf of all its affiliated MLSs, NAR addressed this antitrust problem in 1971. As the FTC explained:

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points.[66]

54. NAR's November 15, 1971, statement, setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points" antitrust policy. Point 11 of the policy specifically addressed the antitrust problem caused by mandatory submission rules by guaranteeing an alternative method of selling

---

[63] *Consol. Multiple Listing Serv., Inc.*, 2009 WL 3150388, at *2.

[64] 2007 DOJ/FTC Report at 63; *see also Realty Multi-List*, 629 F.2d 1351; *Realcomp II*, 635 F.3d 815.

[65] 2007 DOJ/FTC Report at 64 (describing and citing cases).

[66] Butters Report at 109.

residential properties to the MLS: the "office exclusive."[67] Specifically, the antitrust policy expressly provided that "***MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'***"[68] Point 10 provided that "***MLS shall not: Make any rule regulating the advertising or promotion of any listing.***"[69] The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[70] The term "office exclusive" just meant the listing was not provided to the MLS, and before Stellar MLS adopted the Anticompetitive Rules, a homeowner could market the home however she wanted.[71] Stellar MLS's mandatory submission rules cannot possibly comply with the antitrust laws because agents and homeowners have no freedom to avoid Stellar MLS's restrictions or market their homes how they choose under the Anticompetitive Rules.

---

[67] *Id.* at 130.

[68] *Id*. at 134 n.354 (emphasis added).

[69] *Id.* (emphasis added).

[70] *Id.* at 130.

[71] *See* Stellar MLS, *Owner's Waiver of MLS Entry* (rev. June 2019), https://wpbor.com/wp-content/uploads/2019/06/owners-waiver-of-mls-entry-2-1.pdf.; My Florida Regional Multiple Listing Service, *Rules and Regulations* art. 5, § 11 (rev. Sept. 2014) ("Exempt Listings"), https://www.unlimitedmls.com/forms/MFR-MLS-Rules-and-Regs-December-2014.pdf; Stellar MLS, *Rules and Regulations*, *supra* note 7, arts. 5.1, 5.11.

***The Anticompetitive Rules***

55. Stellar MLS's rules are approved by its Board of Directors, a majority of whose members are working brokers and agents.[72] Amendments to Stellar MLS's rules require a majority vote of the members of its Board of Directors.[73] A sanctioned agent may request a hearing before a Hearing Panel "appointed in accordance with current Stellar MLS policy"; the panel's decisions "will be final," and "appeals based on due-process grounds will be heard and decided by the Executive Committee" of Stellar MLS's Board of Directors.[74]

56. Article 05.01 provides that a participant must enter each listing of a covered property type in Stellar MLS's service area within five business days (excluding weekends and federally recognized holidays) after the later of the owner's dated signature or the listing agreement's beginning date, or within one business day of any public marketing, whichever is sooner. Articles 05.01 and 05.11(B)–(C) dictate how homeowners can publicly market their properties. Unless they give the listing to Stellar MLS within one business day, agents and homeowners may not market the property to the public, which Article 05.01 defines to include flyers in windows, yard signs, public-facing websites, brokerage website displays, email blasts, multi-brokerage

[72] *Board of Directors*, Stellar MLS, https://www.stellarmls.com/about/directors; Stellar MLS, Operating Policies & Procedures Manual § I.B.1. (Aug. 16, 2024), https://irp.cdn-website.com/3d0f9886/files/uploaded/Stellar_MLS_Operating_Policies_and_Procedures_as_of_08-16-2024.pdf.

[73] Stellar MLS Rules art. 21.01.

[74] *Id.* art. 12.02.

listing sharing networks, and applications available to the general public.[75] Article 05.11 bars all public marketing of an Office Exclusive listing, with or without a Temporary Exclusion.[76] The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS.

57. If a Stellar MLS Participant violates Stellar MLS's rules, Stellar MLS can punish the real estate agent and/or brokerage by levying fines or blocking their access to the listings database.[77] Pursuant to Stellar MLS's "Automatic Fines Schedule," a violation of Stellar MLS Rules Article 05.01's public-marketing provision is a "Level III - Severe" violation punishable by an automatic $500 fine for the first offense and a $2,500 fine for the second.[78] These fines issue without the courtesy warning and grace period (ordinarily three business days) that precede fines under Stellar MLS's General Fine Schedule, and an agent who does not correct the listing and pay the fine within 30 days of its issuance is suspended until the agent does so.[79] Stellar MLS thus punishes public marketing more harshly than violations subject to its General Fine Schedule: the $500 first-offense fine is ten times the $50 first-offense fine under Stellar MLS's General Fine Schedule; the $2,500 second-offense fine is the largest second-offense

[75] *Id.* art. 05.01.

[76] *Id.* art. 05.11(B)–(C).

[77] *Id.* arts. 11.01, 11.04.

[78] *Id.* arts. 05.01, 11.04(C).

[79] *Id.* art. 11.04(A), (D)(v).

fine in any of its fine schedules; and a third offense requires a hearing, while violations under its other schedules do not require one until the fourth offense.[80] Stellar MLS Rules Article 11.04 also gives Stellar MLS discretion, at a mandatory hearing for a third or subsequent offense of the same violation, to impose a fine of up to $15,000 and to suspend or terminate MLS privileges and services.[81] Stellar MLS polices its rules, as do Stellar MLS's members.

***See It First™ on Compass***

58. A homeowner may decide to submit a property listing immediately to the MLS for distribution. Alternatively, a homeowner may decide to engage in one or more public marketing strategies that precede distribution through the MLS. These pre- and off-MLS strategies may take a number of different forms. "Office exclusives" are a long-standing practice of publicly marketing a property off the MLS. Another alternative is a "Coming Soon" listing, where a listing is available to other participants in the MLS and may be posted to an agent's website or to other selected websites.

59. Compass is an innovative, technology-forward real estate brokerage. From its founding in 2012, Compass has invested in and developed pre- and off-MLS marketing strategies. These marketing strategies allow homeowners to choose effective options to meet their goals. Today, Compass refers to these strategies under its "See It First™ on Compass" umbrella; a prior version was called Compass' 3-Phased Marketing

---

[80] *Id.* art. 11.04(B)–(C).

[81] *Id.* art. 11.04(C).

Strategy. Compass agents offer See It First™ on Compass to clients where MLS rules permit it, although Stellar MLS impedes that competition to protect its members, who are Compass' competition.

60. Compass agents always discuss the advantages and disadvantages of immediate MLS distribution and phased marketing with the homeowner. The homeowner decides what to do. When working with a Compass agent, a homeowner who opts to use See It First™ on Compass as a strategy signs disclosures[82] acknowledging that the listing will not initially appear in the active MLS feed.

61. In the first phase of See It First™ on Compass, agents do not list the property on the MLS but publicly market listings in every off-MLS way allowed by local MLS rules, including informing viewers on Compass' website that (unspecified) off-MLS listings exist in the area in which the user is searching. A prospective buyer need not hire a Compass agent, or any agent, to learn about or obtain access to these listings. A buyer may contact a Compass office directly, ask a non-Compass agent to contact Compass, or register on their own without charge. Agents at other brokerages also can view these listings on request.

62. In the second phase of See It First™ on Compass, the listing moves to a "Coming Soon" status. If the homeowner instructs the agent to do so, Compass advertises "Coming Soon" listings on its own website and also distributes them to Redfin.com, a third-party real estate site, which combined have over 50 million

[82] These disclosures are available at https://www.compass-homeowners.com.

monthly active users. Coming Soon status signals to prospective buyers that the property will soon become active on the MLS and allows the homeowner to gather valuable feedback about the property before that point.

63. Finally, after these first two phases, the property moves to the third phase and goes active on the MLS and is sent by the MLS to tens of thousands of internet websites and data vendors. The homeowner and agent benefit from the pre-MLS phases because they will have provided insight on pricing, staging, and marketing strategy. Some listings sell before reaching broad MLS distribution, but more than 93% continue to the third phase, listing on the MLS.

64. The listing is the homeowner's advertisement for the home. Like any seller of property, the homeowner is entitled to say whatever she wants in the listing to sell the home so long as the listing complies with the law. And, just like a seller of anything, a homeowner should not be forced to put things into their advertisement that hurt the homeowner unless required by the law. A homeowner should not be forced to tell a buyer all the ways that the buyer can negotiate against the homeowner. But the MLS forces the homeowner's advertisement—the listing—to contain things that are not required by the law and that no reasonable homeowner would want in their listing, including days on market and history of price changes.

65. The phased marketing strategy has several advantages for homeowners.

66. ***First,*** because MLSs put the history of price changes onto the listing, and price cuts are perceived by buyers as signaling desperation, homeowners often forgo asking a higher price at the outset to avoid the risk of having to cut the price and reduce their

bargaining leverage relative to buyers. This can prevent homeowners from obtaining the full value of their properties. By testing an aspirational price in a pre-MLS phase, homeowners may obtain a higher price with less risk of a price cut later. A pre-MLS listing also avoids third-party aggregators applying their own flawed pricing algorithms to public listings, which could reduce the amount potential buyers might offer for the property.

67. ***Second***, because off-MLS pre-marketing reduces the risk to homeowners of attempting to market their property before making costly upgrades, renovations, cosmetic improvements, professional photographs, or other investments, off-MLS pre-marketing can save the homeowner the costs of making such investments.

68. ***Third,*** MLSs publish the number of days a listing has been on the MLS, and a higher number is likewise perceived by buyers as increasing their bargaining leverage relative to sellers. Pre-MLS marketing allows homeowners to test the market, build buyer interest, and refine their strategy without incurring days on the market.

69. ***Fourth,*** pre- and off-MLS marketing offer the chance to sell a house without the inconvenience that comes with publicly listing it for sale and offer the chance to assess whether expensive renovations are necessary to make the house more attractive to the broader market. Indeed, a homeowner may not yet be fully convinced that they want to sell the property or may want to avoid disruptive showings.

70. See It First™ on Compass offers homeowners the ability to market a property prior to full preparation, which may allow homeowners to reduce or avoid the costs, time, and risks associated with pre-sale improvements, while retaining the option to

accept or decline early offers. Indeed, reported transactions are consistent with these benefits. For example, a homeowner experiencing a time of distress needed to sell her property quickly and was able to secure a buyer within a short period, without dimensions or even pictures through pre-marketing. Compass agents appreciate the ability to offer innovative strategies that help homeowners achieve their goals.

71. This phased marketing strategy is good for homeowners, good for agents seeking to represent homeowners, and good for Compass. Compared with listings sent directly to an active MLS feed, properties marketed through Compass' phased marketing strategy had 34% fewer days on the MLS and experienced 29% fewer price cuts. Additionally, properties sold for 4.6% more. The phased marketing strategy does, however, threaten incumbent brokerages by forcing them to compete against Compass for homeowner clients and for agents who want to offer such innovative marketing strategies to their homeowner clients.

72. Homeowner demand for phased marketing has been substantial in the many areas of the country where MLSs allow Compass to offer it. By March 2025, approximately 48% of Compass homeowners selected phased marketing. After March 2025, the percentage of phased marketing listings fell due to Zillow's adoption of "Listing Access Standards" banning pre-marketed listings from Zillow and affiliated sites. The Listing Access Standards are similar to the Anticompetitive Rules in that they deny access to a public marketing platform, in that case Zillow's, based solely on the homeowner's decision to first market a property by other means. In a recent federal antitrust case, Zillow argued that its Listing Access Standards promoted competition

by reducing pre-MLS marketing, but the court held both that Zillow failed to prove its claims and that the "record . . . identifie[d] plausible procompetitive effects from" strategies such as Compass' phased marketing strategy.[83]

73. Recognizing the benefits of pre- and off-MLS marketing for many homeowners, many MLSs do not penalize agents and homeowners for such marketing. MLSs serving more than 350,000 brokers and agents in at least 12 states allow homeowners to publicly market their properties, and those MLSs continue to succeed.

***Anticompetitive Effects***

74. The Anticompetitive Rules restrain trade in several ways.

75. ***First***, because Stellar MLS's participating brokers and agents (including Board members) compete directly with one another and with Compass and its agents for homeowners and homebuyers, implementation and enforcement of the Anticompetitive Rules block competition from agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported, "On its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[84]

76. ***Second***, Stellar MLS is blocking competition by other public marketing methods, identified by Stellar MLS Rules Article 05.01 as including flyers in windows, yard

---

[83] *Zillow Group, Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-05451, Mem. Op. & Order 43–44 (N.D. Ill. Sept. 15, 2026), ECF No. 141.

[84] Butters Report at 130.

signs, public-facing websites, brokerage website displays, email blasts, multi-brokerage listing sharing networks, and applications available to the general public,[85] and most significantly the Compass website itself.

77. ***Third***, the Anticompetitive Rules also reduce competition among brokers, including Compass, by preventing them from competing through the timing, sequence, and scope of a listing's distribution.

78. ***Fourth***, the Anticompetitive Rules further reduce competition among brokers, including Compass, by preventing them from competing to attract agents by offering them innovative, appealing ways to serve their homeowner clients.

***Stellar MLS's Justifications Are Pretextual***

79. Stellar MLS has no valid justification for its illegal conduct. Stellar MLS operated without such rules before March 2020, and many MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed. These rules are not required for operating a successful MLS. These are not rules that ensure the integrity of the data distributed by Stellar MLS or prohibit its members from selectively editing or excluding the Stellar MLS listings they show their buyer clients. The Anticompetitive Rules govern marketing itself and require brokers and their clients to forgo profitable strategies on pain of being fined by or excluded from the MLS.

80. Stellar MLS's restraints on competition are not about "transparency." Stellar

[85] Stellar MLS Rules art. 05.01.

MLS does not allow homeowners or homebuyers to become participants or to directly access its database; participation requires a current, valid real estate broker's license or a state appraiser license or certification.[86] And Stellar MLS's own rules allow listings to be hidden, just as long as they are not publicly marketed.[87] Nor are Stellar MLS's restraints about equal access for buyers; any buyer, and any buyer's agent, can learn about, tour, and make an offer on a property marketed through See It First™ on Compass without hiring a Compass agent. Indeed, without See It First™ on Compass as an option, some homeowners would not choose to sell their property, ultimately reducing the inventory of homes on the market.

81. Stellar MLS's restraints also have nothing to do with "free-riding." In the first place, Compass does not seek special treatment. If Compass has its way, ***every*** member of Stellar MLS will be free to offer pre- and off-MLS marketing strategies to their clients.

82. Compass does not benefit from the contributions of other brokerages to the MLS without contributing to the benefits that other brokerages can obtain from the MLS. Compass contributes substantially to the benefits obtained by other brokerages and would continue to do so under the See It First™ on Compass program. Compass provides value to Stellar MLS and its members in three critical ways: (1) by exposing its buyer clients to listings submitted by other members; (2) by submitting listings to

---

[86] *Id.* art. 01.03; *see also id.* art. 04.27.

[87] *See id.* art. 05.11(B)–(C).

Stellar MLS post-sale even when they were not previously submitted to Stellar MLS, adding to the body of information that members use for advising clients on pricing and other matters; and (3) by submitting listings to Stellar MLS for the benefit of all buyer agents in the Stellar MLS service area after the first two phases of the phased marketing strategy, which would happen for over 93% of all pre-marketed listings based on experience elsewhere. Indeed, Compass contributes a substantial number of listings to Stellar MLS.

83. Stellar MLS has defended the Anticompetitive Rules on the grounds that they promote transparency, cooperation, and fair housing, and that its other listing options, including Coming Soon and Delayed Distribution, "provide a significant level of flexibility for marketing a listing."[88] Those arguments amount to little more than paternalistically trying to control the behavior of participants in the residential real estate market. Competition requires innovation, and consumers will ultimately decide what innovations are worthwhile.

84. Stellar MLS's purported alternatives do not cure the restraint. Stellar MLS Rules Article 05.11(B), called an "Office Exclusive," requires that the property be kept hidden and marketed exclusively within the listing brokerage—no yard sign, no website, no social media post. It also requires that the listing be entered into Stellar MLS, where it "will only be available to the listing broker's office."[89] Its "Office

---

[88] Oct. 20 Letter at 1.

[89] Stellar MLS Rules arts. 05.01, 05.11(B).

Exclusive with Temporary Exclusion" option is narrower still.[90] Its "Delayed Distribution" option holds a listing back from IDX display and third-party syndication for five days, but requires that the listing be entered into Stellar MLS, where it "will be fully active and available to all MLS Participants and Subscribers in every capacity."[91] And its "Coming Soon" option likewise requires entry into Stellar MLS, makes the listing available to all participants and subscribers, and lasts no more than 14 calendar days.[92] None of these options lets a homeowner publicly market a home without giving it, within one business day, to every competing Stellar MLS participant.[93] And the listings Stellar MLS exempts from its submission requirement because it refuses to accept them include the "Open Listing," which Stellar MLS describes as "not in writing"; using it requires the homeowner to give up a written listing agreement.[94]

***Antitrust Injury to Compass, Its Agents, and Homeowners***

85. Stellar MLS's conduct causes significant, direct harm to Compass, its agents, and consumers. The harm resulting from this anticompetitive scheme encompasses the

---

[90] *Id.* art. 05.11(C).

[91] *Id.* art. 05.11(D).

[92] *Id.* art. 05.11(E).

[93] *See id.* arts. 05.01, 05.11(B)–(E). The DOJ views mandatory-listing policies, coupled with "exceptions benefitting primarily large brokerages," as anticompetitive. Supplemental Statement of Interest of the United States, *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS, ECF No. 358, at 7 n.2 (D. Mass. Mar. 17, 2025). Stellar MLS's Office Exclusive option is precisely the sort of "exception" that makes the Anticompetitive Rules anticompetitive.

[94] Stellar MLS Rules art. 05.04(B); *see id.* art. 05.04 (listing types not accepted "would not be subject to Article 5.01").

following:

a. Lost Commissions and Financial Harm to Brokerage: Compass has suffered direct financial harm through lost commissions due to Compass' inability to offer homeowners its phased marketing strategy, a superior product that attracts homeowners to Compass. Compass has also suffered direct financial harm through lost revenue from those homeowners through ancillary services, such as title and escrow services and mortgage services.

b. Degradation of Compass Website: The enforcement of the Anticompetitive Rules degrades Compass' proprietary technology platform by preventing Compass from posting pre-MLS listings in See It First™ on Compass, artificially suppressing web traffic and prospective leads.

c. Depressed Sales Prices and Lost Sales: By eliminating Compass' ability to pre-market and test pricing, Stellar MLS rules force homeowners to launch blind on the MLS, frequently resulting in mispricing that depresses final home values, in lost sales, and in reduced commissions.

d. Excessive Days on Market and Public Price Drops: Forcing properties onto the MLS prematurely subjects them to the stigma of accumulating "days on market" and price reductions on the listing, which depress sale prices and related sales commissions.

e. Lost Agents: The Anticompetitive Rules prevent Compass from

competing against other brokerages for agents by offering agents innovative pre-marketing strategies that they can offer their clients.

f. Loss of Convenience and Harm to Innovation: Homeowners are stripped of convenience surrounding their home sale, and consumers suffer from the commoditization of agent services and a reduction in pro-competitive choice.

86. Compass and its agents and homeowners have thus suffered antitrust injury as a result of the rules imposed by Stellar MLS and the agents and brokerages who control it. Stellar MLS's rules are anticompetitive because they foreclose homeowners and their agents from choosing a marketing strategy—limited, staged listing—that a substantial share of the market demands, thereby reducing product variety and consumer choice in the Relevant Markets. This restraint on competition directly causes Compass' injury: because Compass' phased marketing offering depends on the very marketing flexibility that the Anticompetitive Rules foreclose, Stellar MLS's rules prevent Compass from offering phased marketing to homeowners and agents in the Stellar MLS service area, making Compass less competitive in the Brokerage Services Market and the Agent Services Market. The mechanism of harm to competition and the mechanism of harm to Compass are one and the same: Stellar MLS's rules prevent Compass from offering homeowners and agents innovative strategies they want.

87. Compass is therefore a proper party to bring this action. Compass' injury is direct, not derivative: it flows immediately from Stellar MLS's rules and their enforcement against Compass agents and their homeowner clients. Compass'

damages, including lost commissions, lost revenue from ancillary services, and diminished value of its technology platform, are neither speculative nor unduly complex to ascertain.

***Stellar MLS's Threatened Rule Enforcement Against Compass***

88. By enforcing the Anticompetitive Rules through the threat of automatic fines of $500 and $2,500, mandatory disciplinary hearings for third and later violations at which Stellar MLS may impose fines of up to $15,000, and suspension and expulsion from the MLS, Stellar MLS has made it impossible for Compass to perform its obligations in accordance with homeowners' instructions.[95]

89. On August 27, 2026, Compass asked Stellar MLS to agree that it would not fine or penalize real estate professionals for publicly marketing office exclusive listings.[96] On September 1, 2026, Stellar MLS, through counsel, responded that it "cannot agree" and that, unless its Board decided otherwise, it "will continue to apply and consistently enforce its existing rules."[97] On September 8, 2026, Compass, through counsel, demanded that Stellar MLS confirm in writing by October 6, 2026, that it "will not fine or punish a real estate professional for *publicly* marketing office exclusive listings."[98] On October 6, 2026, Stellar MLS's counsel asked for more time to respond

---

[95] *See* Stellar MLS Rules arts. 05.01, 11.04(C).

[96] Email from Ethan Glass, Chief Legal Officer, Compass International Holdings, to MLS Leadership (bcc to Stellar MLS's CEO) (Aug. 27, 2026).

[97] Sept. 1 Email.

[98] Letter from Nathan P. Eimer to Shayne Fairley, Chief Executive Officer, Stellar MLS (Sept. 8, 2026).

so that its Board of Directors could consider the demand; Compass extended the deadline to October 20, 2026.[99] On October 20, 2026, Stellar MLS, through counsel, responded. It did not agree to stop enforcing the Anticompetitive Rules. Instead, it asserted that its rules "fully comply with the letter and spirit of the antitrust laws" and pointed Compass to its existing Delayed Distribution and Coming Soon options, each of which requires the listing to be entered into Stellar MLS.[100]

***Stellar MLS's Continuing Violations***

90. Stellar MLS's anticompetitive conduct is ongoing. The Anticompetitive Rules are not merely rules adopted in the past; they are a continuing agreement among competing brokers to penalize and exclude any broker or agent who follows a homeowner's instruction to publicly market a home outside the MLS, and Stellar MLS enforces that agreement through automatic fines of $500 and $2,500, mandatory hearings for third and later violations at which Stellar MLS may impose fines of up to $15,000, and the threat of suspension and expulsion.[101]

91. Within the four years before this complaint was filed, Stellar MLS and its co-conspirators have committed new and independent acts that renew the restraint and inflict new and accumulating injury on Compass, including:

a. re-adopting and re-approving the Anticompetitive Rules through Stellar

[99] Letter from John A. Boudet to Nathan P. Eimer (Oct. 6, 2026); Email from Nathan P. Eimer to Clara Torres, cc John A. Boudet (Oct. 6, 2026).

[100] Oct. 20 Letter.

[101] Stellar MLS Rules arts. 05.01, 11.04(C).

MLS's Board of Directors, including when it amended Articles 05.01 and 05.11 in August 2025 while keeping the requirement that listings be entered into Stellar MLS;[102]

b. adding a Coming Soon status, which also requires that the listing be entered into Stellar MLS, where it is available to all participants and subscribers;[103]

c. maintaining an MLS Advisory Council of the Shareholder Associations and Stellar MLS's customer associations, whose members, according to Stellar MLS, "determine the MLS's rules and regulations" and submit their recommendations to its Board of Directors through its executive committee;[104]

d. rejecting Compass' demands on September 1 and October 20, 2026; and

e. continuing, each day, to prohibit Compass and its agents from publicly marketing listings in accordance with homeowners' instructions.

92. Each of these acts required Stellar MLS to make a fresh, discretionary decision to maintain, tighten, or enforce the Anticompetitive Rules—a decision Stellar MLS was free not to make. Each act caused Compass new injury—lost commissions, lost ancillary revenue, lost agents, and diminished value of its technology platform—that

---

[102] *Id.* arts. 05.01, 05.11(B), (D), 21.01.

[103] *Id.* art. 05.11(E); '*Coming Soon' Status Listings*, Stellar MLS, https://www.stellarmls.com/coming-soon-listings (describing Coming Soon as "a new listing status").

[104] *Shareholders*, Stellar MLS, https://www.stellarmls.com/coming-soon-listings.

Compass could not have recovered in an earlier action because that injury had not yet occurred. Compass seeks damages for injuries caused by acts within the applicable limitations periods, and its claims for injunctive relief are timely because Stellar MLS continues to maintain the Anticompetitive Rules and to threaten their enforcement today.

## COUNT I
## PER SE ILLEGAL GROUP BOYCOTT
## IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

93. Plaintiffs repeat and incorporate by reference Paragraphs 1 through 92 of the Complaint.

94. The majority of Stellar MLS's Board of Directors are brokers or agents who compete directly with each other and with Compass in the Brokerage Services Market and the Agent Services Market. They are therefore horizontal competitors with each other and with Compass.

95. Through the Anticompetitive Rules, Stellar MLS forces Compass and its agents to forgo either (1) a critical input to their business (access to Stellar MLS in the Stellar MLS service area) or (2) the ability to offer innovative pre- and off-MLS marketing strategies to homeowners and agents.

96. The agreement by and among Stellar MLS and its governing members to implement and enforce these rules is, therefore, a *per se* group boycott—a *per se* illegal combination, contract, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Per se* treatment is warranted because Stellar MLS possesses market power

in the MLS Market in the Stellar MLS service area; it controls access to an input—MLS participation—that agents need to compete effectively in the Stellar MLS service area; and the Anticompetitive Rules lack any plausible efficiency justification, because they govern agents' marketing to the public rather than the integrity or sharing of data within the MLS.

97. As a direct and proximate result of Defendant's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## COUNT II
## COMBINATION, CONTRACT, AND CONSPIRACY CONSTITUTING UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

98. Plaintiffs repeat and incorporate by reference Paragraphs 1 through 92 of the Complaint.

99. Stellar MLS is the dominant or sole MLS in the Stellar MLS service area. Membership in Stellar MLS and access to the MLS it operates is critical for agents working in the Stellar MLS service area. Stellar MLS is controlled by agents and brokerages who are horizontal competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. Stellar MLS and the agents and brokerages who control it are using their control of Stellar MLS to restrain competition in the Brokerage Services Market and the Agent Services Market by implementing and enforcing the Anticompetitive Rules, which prevent Compass from

offering See It First™ on Compass to its homeowner clients and agents and prevent any other agent from offering innovative pre- and off-MLS marketing strategies.

100. The rules' anticompetitive effects—reduced product variety, reduced competition among brokers on the timing, sequence, and scope of listing distribution, and reduced competition for agents—substantially outweigh any pro-competitive benefit. Any legitimate objective could be achieved through substantially less restrictive means, including the homeowner-instruction option Stellar MLS offered before March 2020 and the rules of the many MLSs that permit pre-MLS public marketing. Alternatively, the anticompetitive character of the rules is obvious enough to warrant an abbreviated, "quick look" analysis.

101. As a direct and proximate result of Defendant's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

**REQUESTED RELIEF**

Compass requests the following:

A. A declaration that the Anticompetitive Rules are an unlawful restraint of trade under 15 U.S.C. § 1;

B. An injunction prohibiting Stellar MLS from adopting, maintaining, or enforcing the Anticompetitive Rules, or any similar rule, to penalize any participant or subscriber for publicly marketing a property that the homeowner has directed be withheld from, or submitted later to, the MLS;

C. An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

D. An award of Plaintiffs' attorneys' fees and costs of suit; and

E. Such other relief that the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Compass hereby demands a trial by jury as to all claims so triable.

Dated: November 12, 2026

Respectfully submitted,

/s/ Nathan P. Eimer
Thomas A. Zehnder
Florida Bar No. 0063274
Dustin Mauser-Claassen
Florida Bar No. 0119289
King, Blackwell, Zehnder & Wermuth, P.A.
25 East Pine Street
Orlando, FL 32801
Telephone: 407-422-2472
Facsimile: 407-648-0161
tzehnder@kbzwlaw.com
dmauser@kbzwlaw.com

Nathan P. Eimer* (Lead Counsel)
Vanessa G. Jacobsen*
Alec Solotorovsky*
Brian Y. Chang*
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
asolotorovsky@eimerstahl.com

bchang@eimerstahl.com

*Motions for Special Admission Forthcoming

*Counsel for Plaintiffs*